## TAUL v. COMMONWEALTH.

Court of Appeals of Kentucky.
May 16, 1952.

———◆———

S. H. Monarch, Hardinsburg, for appellant.

A. E. Funk, Atty. Gen., Guy L. Dickinson, Asst. Atty. Gen., for appellee.

STANLEY, Commissioner.

The appeal of Dennie Taul is from a conviction of voluntary manslaughter, with a penalty of two years' imprisonment, for the killing of Franklin Armes on August 31, 1950. The appellant urges that he was entitled to a directed verdict of acquittal. The Attorney General does not argue otherwise, but merely passes the record up to us.

The deceased and his two boys, while squirrel hunting, got their automobile stuck in a creek. The defendant, their neighbor, came and helped them to get it out. They and others who had come to the place stood around talking and shooting at a target. Then Armes and his boys went to Taul's house, which appears to be nearby. The boys left the two men there by themselves. Late in the afternoon Taul came to Williams' store, about a mile away, and reported he had shot Armes and his body was in his yard. He wanted to call the sheriff. There is evidence he had been drinking. When the officers arrived, Taul went with them to his home. Armes' body was on its back, five or six feet outside the gate, 16 or 18 feet from the house. He had been shot in the chest and neck with a shotgun. No weapon was on his body and there was no indication he had been drinking.

This is all the evidence for the Commonwealth.

The defendant testified Armes had told his boys to go on home, that he wanted to talk with him for a while. Taul invited Armes in the house out of the rain. He lived alone. The defendant went into great detail, quoting Armes and himself directly, as to what went on for maybe two or three hours. We sift out what seems most significant and illustrative from several pages of his voluble story.

Armes said, "Sit down, you son-of-a-bitch, I want to talk with you." He accused Taul of "talking too much" about "what happened over here, over the hill, along about last Christmas." He said, "You won't talk any more because I am going to kill you." When Taul insisted he had not done as much talking as Armes' own kinpeople, he agreed and said he would get even with them, but, cursing him, again declared his purpose to kill him. Armes said it had cost him $2,000 to get out of the trouble he charged Taul with having caused him. When Taul would undertake to get up out of his chair, Armes would shove him back and hit him. This occurred several times. Finally Armes insisted Taul go to town with him and thence across the river to Cannellton, Indiana, suggesting they would see some women, drink beer and have a good time. Taul refused. When Armes started to leave, Taul started out the back door to escape, but hesitated in fear. About that time Armes hollered something to him. Taul picked up his shotgun and rifle in the back room and put them on the porch, thinking, he said, that Armes would not find them there. He tried to get Armes to go on home, saying he would see him later and straighten out all the trouble. Armes made no reply, but kept coming towards Taul, who kept calling on him to go back. He then reached over and got his shotgun. Continuing his account: "'Now, Franklin, you ain't coming in here and do me like you been doing me—you stop and go home'—but he just kept coming, and so then I reached for my shotgun and held it and said, 'You see this gun, it is loaded and the hammer is back and my finger is on the trigger and I will shoot you before I'll be mistreated again; you ain't coming in this

house'—but he kept on coming, and then I said, 'Franklin, you stop or I am going to shoot you,' and he said, 'You son-of-a-bitch I am coming in there and get you,' and I said, 'No, you ain't coming in here; don't come in that gate; stop and go back' and he was pretty near it—and I said, 'I am going to pull the trigger' and he said, 'You ain't got the nerve'; and I did—and he fell, turned on his heel and fell backwards with his foot over here."

Taul then ran to a neighbor's house, but could arouse no one. He then ran on "as hard as I could" to the Williams store and told what happened. He denied drinking that day, except a drink before breakfast, and stated he was entirely exhausted from the long run; that he was "shaking and choking; I couldn't hardly make it." The defendant insisted that he shot Armes only because he was sure he would be killed if he did not. His story was not weakened by the test of cross-examination.

The defendant is a frail man, 66 years old. The deceased was much younger and weighed 165 pounds. There had never been any previous trouble between them.

Mrs. Ernest Dowell testified that Armes had come to her house about a week before he was killed and asked for her husband. When told he was not at home, Armes said he would see him and "get even with him and Harlan and that little bow-legged son-of-a-bitch Dennie Taul on the hill; and I might get him first."

The defendant proved that he bore a good reputation for being a peaceable man, and that Armes did not, although two or three witnesses stated as to Armes that they had "heard it both ways" and otherwise equivocated.

■ Where the defendant is shown to have committed the act of killing, and he pleads self-defense, it is incumbent upon him to establish justification unless the evidence, presented by the prosecution, shows a state of facts justifying the act. Minix v. Commonwealth, 266 Ky. 801, 100 S.W.2d 825; Richie v. Commonwealth, Ky., 242 S.W.2d 1000.

■ What constitutes self-defense is a question of law for the court, but whether the killing was committed in self-defense is for the jury to determine where there is evidence, with rational inferences, to the effect that it was not so committed. Where the accused testifies to a clear case of self-defense, and the evidence, including circumstances to the contrary and reasonable inferences do not tend to disprove it, the court should instruct a verdict of acquittal. We state it another way. Before the so-called scintilla rule was abandoned, it was frequently declared that where the verdict of guilty was so flagrantly and manifestly against the evidence as to indicate that it was reached through passion and prejudice rather than from the evidence, it was the duty of the trial court to grant the defendant a new trial. Roberson's Kentucky Criminal Law, Sec. 1964. Under the present practice, in both civil and criminal cases if, upon considering the evidence before submission, the trial court is of opinion that a verdict of guilty would be flagrantly against that evidence, i. e., not reasonably supported, he should direct an acquittal. And where this court is led to the conclusion that the verdict is thus contrary to the evidence, it is our duty to reverse the judgment for a new trial with directions to instruct an acquittal if on another trial the evidence of guilt is no more substantial. That is the holding of the Nugent case, Nugent v. Nugents' Ex'r, 281 Ky. 263, 135 S.W.2d 877, and its progeny. We appraise the record for the application.

■ The mere fact that a man says he killed another in self-defense, or describes events which show that to be the case, does not have to be accepted at face value where the jury may reasonably infer from his incredibility or the inherent improbability of his own testimony, or all the revealed circumstances, that one or more of the several factors that qualify or enter into the legal right of self-defense were missing. Among these are reasonableness of the defendant's belief of imminent danger of great bodily injury or loss of life, the necessity or reasonable judgment of necessity to shoot to avert that

48

danger, real or apparent, and the absence of aggression by the defendant. The only evidence of the prosecution in this case is the defendant's statements that he had killed Armes and that the defendant was intoxicated. That is all. On the trial, he admitted the killing but denied being intoxicated. It is true the defendant did not place any weapon or missile of a deadly character in the hands of the man he killed, and none was found on his unmolested body. But the deceased was a man of greater size and strength and bore a reputation at least of not being a man peaceably inclined, so it cannot be said the defendant could not reasonably have apprehended great injury or death, as the victim was threatening to cause. Where such is the relative physical ability and belligerent character of the participants, and there is an apparent purpose by the stronger thus to harm the weaker, it cannot be said as a matter of law that he was not justified in using a deadly weapon to defend himself. Roberson, Sec. 307. And no man assaulted and mistreated in his own home is required to retreat or seek another place of safety. Roberson, Sec. 314. There is nothing whatever that suggests the defendant was the aggressor. Corroboration of threats by the deceased, the respective reputations as to being peaceable men, the deceased's action in staying behind with the defendant alone, the fact that he was shot in the chest and neck, and the defendant's own consistent actions under the excitement of the occasion of having killed his neighbor—all go to sustain the verbal testimony of self-defense, rather than to refute it.

Scrutinizing the entire record, we find nothing therein from which the jury could reasonably and fairly base an inference that the defendant's story was not true. The verdict strikes us as being flagrantly against the evidence. It justifies the conclusion it was rendered through some unaccountable passion or prejudice. That being so, the judgment should be set aside and the defendant given a new trial. If upon that trial the evidence of guilt is no stronger than that adduced on this one, the court should direct a verdict of not guilty.

Judgment reversed.