RENDERED: APRIL 27, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0579-MR

ANSHANIQUE M. LEAVELL                                          APPELLANT


V.
ON APPEAL FROM CHRISTIAN CIRCUIT COURT
HONORABLE JOHN L. ATKINS, JUDGE
NO. 19-CR-00522


COMMONWEALTH OF KENTUCKY                                       APPELLEE


**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

A Christian County jury convicted Anshanique M. Leavell of one count each of murder, receiving stolen property—firearm, and tampering with physical evidence. Leavell received a total sentence of twenty-eight years in prison. This appeal followed as a matter of right. *See* KY. CONST. § 110(2)(b). Having reviewed the record and the arguments of the parties, we affirm the Christian Circuit Court.

## I.  BACKGROUND

Late on the night of June 6, 2019, Rajiana Tandy drove Leavell to meet Amareya Freeman so that Leavell could purchase marijuana from Freeman. When Leavell and Tandy arrived at the apartment complex where Freeman was located, Leavell contacted Freeman who then came out to the car. Freeman walked away from the car and then came back. Leavell and Freeman spoke

through Leavell's rolled down passenger window. Leavell never left the car. At some point, Tandy, while looking in her rearview mirror, saw Freeman run past her car. She then heard a gunshot. When Tandy heard the gunshot, Leavell was partially in the car and partially hanging out of the passenger side window. Tandy and Leavell then left the apartment complex. Tandy never saw a gun but later that night found out via social media that Freeman had been shot. Tandy sent a screenshot of the social media post to Leavell but could not remember what Leavell's response had been. After seeing the post, Tandy went to the police station with her mother to provide a statement.

While investigating the scene, police searched Freeman's apartment. In that apartment, police found a Glock handgun case that did not contain a gun. They also found a receipt for the purchase of a Glock 27 .40 caliber handgun and a box of .40 caliber ammunition. The purchaser listed on the receipt was Freeman. The gun had been seized during a police raid of the apartment the previous January. A box of .40 caliber ammunition, however, was found in the apartment on the night of the shooting, but nine rounds were missing. Police also found two bags of marijuana—one containing twenty-five grams and the other containing two grams.

Police also conducted a cursory search of the apartment next door to Freeman's, where Dedrick Brodie, Brodie's girlfriend, and Brodie's son lived. Brodie and Freeman had been hanging out together a short time before the shooting, and police were looking for Freeman's phone. Police did not find the

phone and did not look for any other specific item in Brodie's apartment, including a gun.

Approximately one to one and a half hours after the shooting, police conducted a traffic stop on a vehicle in which Leavell was a passenger. Upon smelling marijuana, police searched the vehicle. Police found a handgun in the vehicle. The gun was wrapped in a t-shirt and in a pink bag in the center console of the vehicle. The gun had been reported stolen on June 6, 2019, from Livingston County, Kentucky. Leavell was then taken into custody and interviewed.

During her police interview, Leavell denied any involvement in Freeman's death for approximately the first thirty minutes of the interview. Police detectives eventually told Leavell that guns have a "signature" and that the "signature" of the gun found in the car was found at the scene of Freeman's shooting. At that point, Leavell admitted that the gun was hers and that she fired it at Freeman. Leavell explained that she had met with Freeman to purchase marijuana. She stated that Freeman was acting "strange" and trying to get her to come into his apartment. She also stated that Freeman grabbed at his waistband, like he was reaching for something, but that it was dark outside. Although Leavell said that she acted in self-defense, she also explained that Freeman took her $50, and asked rhetorically, "What was I supposed to do?"

Leavell was indicted and tried before a jury on the charges of murder, receiving stolen property—firearm, and tampering with physical evidence. At

3

trial, Leavell asserted that she acted in self-defense. Leavell relied heavily on the medical examiner's testimony to support her claim of self-defense. The medical examiner testified that the bullet entered the upper middle of Freeman's chest, slightly to the right of the breastbone. The bullet hit a rib and exited through Freeman's upper left back. The medical examiner also testified that Freeman had what appeared to be gunshot graze wounds on the back of his right foreman, near the wrist. Based on the wounds, the medical examiner testified that Freeman was most likely predominately facing the shooter with his right arm stretched out straight in front of him with his palm facing down. Leavell argued that Freeman could have been holding a gun in his right hand and pointing it at her at the time he was shot.

Leavell further asserted a theory that Brodie, after finding Freeman shot, took Freeman's gun and the $50 Leavell had given Freeman, prior to the police arrival on scene. The jury, however, found Leavell guilty of all charges. This appeal followed.

## II. ANALYSIS

Leavell alleges several errors by the trial court and urges this Court to reverse her conviction. First, she alleges that the trial court erred in admitting testimony that Leavell did not act consistently with someone who truly acted in self-defense in violation of *Ordway v. Commonwealth*, 391 S.W.3d 762 (Ky. 2013). Second, she alleges that the trial court erred in denying her motions for a directed verdict on the charges of murder and tampering with physical evidence. Third, she alleges the trial court erred in admitting evidence that

4

Leavell was potentially affiliated with a gang. Fourth, she alleges the Commonwealth's Attorney engaged in prosecutorial misconduct. Finally, she urges this Court to reverse her convictions based on cumulative error. We address each of Leavell's arguments in turn.

## A. The trial court did not err in admitting testimony that Leavell did not act consistently with someone who acted in self-defense.

Leavell first argues that the trial court erred in admitting testimony from Hopkinsville Police Detective Jason Sears. In this testimony, Detective Sears opined that generally when a person has acted in self-defense, he or she immediately discloses to police that his or her actions were taken in self-defense. In stating this, Detective Sears implied that Leavell did not act consistently with someone who truly acted in self-defense. Leavell asserts that this testimony violated our holding in *Ordway v. Commonwealth*, 391 S.W.3d 762.

In *Ordway*, the defendant was convicted of capital murder related to the fatal shooting of two of his acquaintances. *Id.* at 771–72. Ordway claimed at trial that he had acted in self-defense. *Id.* at 771. Responding to questioning from the Commonwealth, an investigating detective testified that Ordway "did not act like those who had lawfully protected themselves but, had instead acted like those who were fabricating a self-protection defense." *Id.* at 775. We held that "a party may not introduce evidence of the habit of a class of individuals either to prove that another member of the class acted the same way under similar circumstances or to prove that the person was a member of that class

5

because he acted the same way under similar circumstances." *Id.* at 776 (citation omitted).

We explained that in *Ordway*, "[t]he opinion of an experienced and respected police detective that [Ordway]'s conduct did not match the stereotypical conduct of an innocent person acting in self-defense authoritatively portrayed [Ordway]'s defense as a fabrication." *Id.* at 777. We further explained that the detective's testimony "in effect, urged the jury to depend upon his apparent expertise as a police officer and his perception and opinion about matters outside the realm of common knowledge." *Id.* at 776–77. Finally, we held that it was improper for a police detective "to authoritatively suggest how innocent persons behave after they lawfully engage in an act of self-defense, and to then, with some measure of certainty, exclude Appellant from that class of persons based upon his conduct following the shooting." *Id.* at 775–76.

The context of Detective Sears's testimony in this case, however, is distinguishable from the context of the testimony elicited in *Ordway*. In this case, the Commonwealth first called Detective Sears to testify during its case-in-chief. Leavell then recalled Detective Sears during her case-in-chief. During re-re-direct of Detective Sears, the following exchange occurred between defense counsel and the detective:

> Defense Counsel (Defense): Detective Sears, you said you've been doing this for, been an officer for, twenty plus years? Is that correct?
>
> Detective Sears (Detective): Yes, yes sir.

Defense: Ok. And you've done so many interviews that you can't remember how many, correct?

Detective: I've done several. I've done a bunch.

Defense: Ok. Is it common for people when they start interviewing you [sic] to kind of downplay what happened, or put it in the best light?

Detective: Is it common for people, or me?

Defense: Is it common for people you interview?

Detective: People, uh, people want to minimize their—they do a lot of times want to minimize their action that's involved in the, the crime, or [unintelligible] they got times they wanna give a, portray themselves in a different mannerism, I should say.

Defense: Ok. That doesn't make what they say later untrue, does it?

Detective: Well, they leave out critical parts of it though, and just sometimes they leave out the, um, I don't know, I guess the meat 'n taters of the real story.

Defense: Ok. So, when she said, "I know I acted in self-defense," what did she leave out?

Detective: Well, that's down the, along the interview along the ways, I mean, we've been into for a while, about thirty minutes, because I had to go over the signature of the gun and everything before she said that. No, that's what she stated.

Defense: Ok. There's nothing left out of that statement; that's a pretty clear declaration, "I acted in self-defense."

Detective: It's a—

Defense: That's the meat and potatoes, correct?

Detective: It's a declaration, but does that mean that it's something that's not minimized, too?

Defense: Nothing further.

7

Immediately after, the Commonwealth began its re-re-cross as follows:

> Commonwealth's Attorney (Commonwealth): When people are interviewed routinely, that self-defense is their defense, they start off with that?
>
> Defense: Objection, speculation.
>
> Trial court:  Overruled.
>
> Commonwealth: Is that not true, from your experience?
>
> Detective: Most times, when somebody comes in, that they had to be forced into a situation, that's their first, that's the first thing they'll bring up. Now I'm not saying—
>
> Commonwealth: That's right, they get it out quick?
>
> Detective: They get it out quick.
>
> Commonwealth: They don't wait?
>
> Detective: Yes, they ain't going to hold on to it until you have to pry it—bring it out.

While the testimony elicited by the Commonwealth from Detective Sears would ordinarily violate *Ordway*, because Leavell first elicited testimony about the way a typical suspect behaves, the trial court did not err in allowing the Commonwealth to elicit similar testimony to rebut the evidence Leavell elicited.

*Ordway*'s directive is equally applicable to **any** party. *Id.* at 776 ("**[A] party** may not introduce evidence of the habit of a class of individuals either to prove that another member of the class acted the same way under similar circumstances or to prove that the person was a member of that class because he acted the same way under similar circumstances." (emphasis added)). As we noted, "The determination of an individual's guilt or innocence must be based upon the evidence of the particular act in question; it cannot be extrapolated

8

from an opinion, that his behavior after the event comports with some standardized perception of how the 'typical' suspect behaves." *Id.* This rule applies with equal force to both a criminal defendant and the Commonwealth. When the defendant attempts to extrapolate from a witness's opinion about suspects in general, it clears a path for the Commonwealth to fully rebut that evidence. *See Blair v. Commonwealth*, 144 S.W.3d 801, 806 (Ky. 2004) ("'Opening the door' . . . occurs when one party introduces an inadmissible fact that opens the door for the opponent to offer similar facts whose only claim to admission is that they negative, explain, or counterbalance the prior inadmissible fact.") (citations omitted). Here, the Commonwealth's elicited testimony did not exist in a vacuum. Instead, it was permissibly responsive to similar testimony immediately preceding it. Based upon the foregoing, the trial court did not err in admitting the testimony of Detective Sears.

Finally, even if the trial court erred in admitting Detective Sears's testimony, this error was harmless. An error is harmless if a "reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 (Ky. 2009) (citation omitted). In this case, evidence admitted at trial showed that Leavell was evasive for the first thirty minutes of her interview. It further showed that when telling Detective Sears what happened on the night of the shooting, Leavell said, "He took my $50. What was I supposed to do?" Leavell did not definitively state that she saw Freeman with a gun, and no gun was found on the scene. The jury also heard that Leavell was potentially affiliated with a gang

9

that had perpetrated other shootings in the area. Finally, Leavell only asserted self-defense after being told that the police were able to match the gun found in the car with her to the shooting. Given this evidence, we can say "with fair assurance that the judgment was not substantially swayed by the error." *Id.*

## B. The trial court did not err in denying Leavell's motions for a directed verdict.

Leavell next argues that the trial court erred in denying her motions for a directed verdict on the charges of murder and tampering with physical evidence. Our directed verdict standard was described in *Commonwealth v. Benham:*

> On a motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purposes of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

816 S.W.2d 186, 187 (Ky. 1991) (citation omitted). "So long as the Commonwealth produces more than a mere scintilla of evidence to support the charges, a defendant's motion for directed verdict should be denied." *Taylor v. Commonwealth,* 617 S.W.3d 321, 324 (Ky. 2020). With these standards in mind, we address each of Leavell's arguments in turn.

10

*1. Murder*

Leavell argues that the trial court erred in denying her motion for a directed verdict on the charge of murder. Under Kentucky Revised Statutes (KRS) 507.020(1) and 503.050, a person is guilty of murder if (1) he or she causes the death of another person, (2) "with intent to cause the death of another person" or while "wantonly engag[ing] in conduct which creates a grave risk of death to another person," and (3) while not privileged to act in self-protection. Regarding self-protection, under KRS 503.050,

> (1) The use of physical force by a defendant upon another person is justifiable when the defendant believes that such force is necessary to protect himself against the use or imminent use of unlawful physical force by the other person.
>
> (2) The use of deadly physical force by a defendant upon another person is justifiable under subsection (1) only when the defendant believes that such force is necessary to protect himself against death, serious physical injury, kidnapping, sexual intercourse compelled by force or threat, felony involving the use of force, or under those circumstances permitted pursuant to KRS 503.055.

Leavell argues that the Commonwealth presented insufficient proof that she was not privileged to act in self-protection. However, this Court has previously explained, "Rarely is a defendant relying upon self-defense entitled to a directed verdict. Only in the unusual case in which the evidence **conclusively** establishes justification and all of the elements of self-defense are present is it proper to direct a verdict of not guilty." *West v. Commonwealth*, 780 S.W.2d 600, 601 (Ky. 1989) (emphasis added). In this case, we cannot say that the evidence "conclusively establishe[d]" that Leavell acted in self-defense.

11

The evidence admitted at trial that supported a self-defense claim came mostly from the medical examiner as described above and Hopkinsville Police Department detectives who either interviewed Leavell after the shooting or who had watched a video recording of this interview. Through the testimony of those detectives, the jury heard Leavell's statements that Freeman reached towards his waistband and possibly pulled something out. However, nothing was found at the scene to indicate that Freeman actually pulled anything out of his waistband, let alone that he pulled out a gun. Further, Tandy testified that she did not see or hear anything that caused her to believe that Leavell had a reason to shoot Freeman.

> This Court has previously
>
> held that a defendant's statement that he acted in self-defense or his description of events which show such to be the case need not be accepted at face value where the jury may infer from his incredibility or the improbability of the circumstances that one or more of the elements necessary to qualify for self-defense is missing.

*Id.* (citing *Taul v. Commonwealth*, 249 S.W.2d 45 (Ky. 1952)). We have also "held that if the evidence relied upon to establish self-defense is contradicted or if there is other evidence from which the jury could reasonably conclude that some element of self-defense is absent, a directed verdict should not be given." *Id.* (citing *Townsend v. Commonwealth*, 474 S.W.2d 352 (Ky. 1971)).

Given the conflicting evidence presented to the jury in this case, the trial court did not err in denying Leavell's motion for a directed verdict on the charge of murder.

12

*2. Tampering with Physical Evidence*

Leavell next argues that the trial court erred in denying her motion for a directed verdict on the charge of tampering with physical evidence. Under KRS 524.100(1)(a), as relevant to Leavell's case,

> A person is guilty of tampering with physical evidence when, believing that an official proceeding is pending or may be instituted, he . . . conceals . . . physical evidence which he believes is about to be produced or used in the official proceeding with intent to impair its verity or availability in the official proceeding.

Leavell argues that the Commonwealth failed to prove both that she concealed the handgun and also that she intended to impair the gun's availability in an official proceeding.

Regarding concealment of the gun, Leavell relies in part on KRS 527.020(8), a subsection of the statute which defines the crime of carrying a concealed deadly weapon. Under that subsection,

> A loaded or unloaded firearm or other deadly weapon shall not be deemed concealed on or about the person if it is located in any enclosed container, compartment, or storage space installed as original equipment in a motor vehicle by its manufacturer, including but not limited to a glove compartment [or] **center console** . . . .

(emphasis added). We need not determine the relevance of KRS 527.020 to our tampering with physical evidence statute, however, because the handgun was not found merely lying in the center console. Instead, it was found wrapped in a t-shirt inside of a pink bag in the center console. The additional actions required to wrap the gun in a t-shirt and place it in a bag before placing it in the center console of the car make KRS 527.020 inapplicable in this case.

13

Leavell further argues that the detective who conducted the traffic stop during which the gun was found did not testify that Leavell made any furtive movements during the stop or that she wrapped up the gun and placed it in the bag during the stop. She also argues that the center console is not an "unconventional" location such that the gun was concealed there.

Finally, Leavell argues that the Commonwealth presented no evidence that she intended to impair the gun's availability in an official proceeding. She asserts that there is no indication that she knew Tandy would report the events of that night to the police. She argues that because there was no evidence that she knew there was a pending official proceeding, there was no evidence that she intended to impair the gun's availability in that proceeding.

"It is well-settled that a jury may make reasonable inferences from the evidence." *Blades v. Commonwealth*, 957 S.W.2d 246, 250 (Ky. 1997) (citations omitted). In this case, the evidence was undisputed that the gun used in the shooting was found wrapped in a t-shirt, in a pink bag, in the center console of a car. Given the multiple layers the police were required to unwrap in order to find the gun, the jury could have reasonably inferred both that the gun was concealed, and that Leavell did so with the intent to impair its availability in an official proceeding. Accordingly, the trial court did not err in denying her motion for a directed verdict on the charge of tampering with physical evidence.

## C. The trial court did not err in admitting testimony that Leavell was potentially affiliated with a gang.

Leavell next argues that the trial court erred in admitting testimony that she was potentially affiliated with a gang because it was improper character

14

evidence. Specifically, she argues that the trial court erroneously admitted testimony that her Facebook username was associated with a local gang suspected of shootings in Christian County, that she was related to someone in the gang, and that she had posted a music video on Facebook in which she rapped about robbers and killers. Regarding the music video, Leavell failed to object at the trial court, leaving this allegation of error unpreserved. Because Leavell did not request palpable error review of the admission of this specific piece of evidence, we will not review it standing alone. *See Shepherd v. Commonwealth*, 251 S.W.3d 309, 316 (Ky. 2008) ("Absent extreme circumstances amounting to a substantial miscarriage of justice, an appellate court will not engage in palpable error review pursuant to RCr 10.26 unless such a request is made and briefed by the appellant.") (citation omitted). Instead, we will only consider the admission of the rap video as an additional piece of evidence suggesting Leavell was associated with a local gang.

This Court reviews a trial court's decision on the admission of evidence for an abuse of discretion. *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007); *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000) (citing *English*, 993 S.W.2d at 945).

Leavell argues that the gang affiliation testimony violated Kentucky Rules of Evidence (KRE) 403 and 404(b). Under KRE 403, relevant evidence "may be

excluded if its probative value is substantially outweighed by the danger of undue prejudice . . ." Under KRE 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith" unless it falls within certain exceptions. Additionally, under KRE 404(a), "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." One exception to that general rule, however, allows for admission of "[e]vidence of a pertinent trait of character or of general moral character offered by an accused, or by the prosecution to rebut the same." KRE 404(a)(1).

In this case, Leavell—not the Commonwealth—first injected the issue of gang affiliation into the trial. Before the Commonwealth ever introduced any evidence of Leavell's potential gang affiliation, Leavell herself asked Tandy if Leavell had any gang relations. Tandy responded in the negative. Leavell then further elicited from Tandy that if Leavell was in fact in a gang, Tandy would have known that information. Thus, by attempting to show her "good" character, Leavell opened the door and "cannot complain if the Commonwealth walked through that door and introduced character evidence not to [her] liking." *Stansbury v. Commonwealth*, 454 S.W.3d 293, 301 (Ky. 2015). Accordingly, the trial court did not abuse its discretion in admitting the evidence of Leavell's potential gang affiliation.

16

## D. The Commonwealth's Attorney did not commit prosecutorial misconduct.

Leavell next argues that the Commonwealth's Attorney committed prosecutorial misconduct. Leavell asserts he did so in four ways. First, she alleges that the Commonwealth's Attorney committed prosecutorial misconduct when he elicited testimony purportedly in violation of *Ordway*. *See* discussion *supra* Subsection A. Second, she alleges the Commonwealth's Attorney committed prosecutorial misconduct when he elicited testimony about her potential gang affiliation. *See* discussion *supra* Subsection C. Third, Leavell asserts that the Commonwealth's Attorney committed prosecutorial misconduct when he posed hypotheticals to both the medical examiner and a detective about the bullet trajectory, improperly implied the medical examiner was not an expert on bullet trajectory, and used a detective that he never qualified as an expert to discredit the medical examiner. Leavell asserts that these actions were taken in order to mislead the jury and prejudice her. Finally, Leavell argues that the Commonwealth's Attorney committed prosecutorial misconduct when he elicited testimony from a detective that Freeman did not have a reputation in the community for violence and did not have a reputation for carrying a gun. Leavell asserts that because that detective did not even know if Freeman had ever purchased a gun, the prosecutor sought to mislead and create a false impression for the jury by eliciting this testimony.

"Prosecutorial misconduct is 'a prosecutor's improper or illegal act involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'" *Commonwealth v. McGorman*, 489 S.W.3d

731, 741–42 (Ky. 2016) (quoting *Noakes v. Commonwealth,* 354 S.W.3d 116, 121 (Ky. 2011)). One way in which the misconduct can occur is through improper questioning. *Duncan v. Commonwealth,* 322 S.W.3d 81, 87 (Ky. 2010) (citation omitted). Any allegation of misconduct must be viewed in the context of the overall fairness of the trial. *McGorman,* 489 S.W.3d at 742 (citing *St. Clair v. Commonwealth,* 451 S.W.3d 597, 640 (Ky. 2014)). To justify reversal, the Commonwealth's misconduct must be "so serious as to render the entire trial fundamentally unfair." *Soto v. Commonwealth,* 139 S.W.3d 827, 873 (Ky. 2004) (quoting *Stopher v. Commonwealth,* 57 S.W.3d 787, 805 (Ky. 2001)).

"If the misconduct is objected to, we will reverse on that ground if proof of the defendant's guilt was not such as to render the misconduct harmless, and if the trial court failed to cure the misconduct with a sufficient admonition to the jury." *Duncan,* 322 S.W.3d at 87. However, if no objection is made, the Court "will reverse only where the misconduct was flagrant and was such as to render the trial fundamentally unfair." *Id.* (citations omitted).

Leavell's first two claims of prosecutorial misconduct—the purported *Ordway* testimony and the gang affiliation testimony—are repetitive of other issues already raised in this appeal. Having determined that the trial court did not err in admitting the testimony Leavell now complains of, we cannot hold that the Commonwealth's Attorney committed prosecutorial misconduct in eliciting said evidence. Further, as we have previously held, "Despite a defendant's characterization, '[i]ssues involving the admission of evidence or

18

testimony, when ruled upon by the trial court, do not constitute prosecutorial misconduct.'" *Noakes*, 354 S.W.3d at 122 (quoting *Stopher,* 57 S.W.3d at 806).

Leavell's third claim of prosecutorial misconduct relates to questions the Commonwealth's Attorney asked to the medical examiner and to a detective regarding the bullet trajectory and the positioning of Freeman's body when he was shot. Leavell asserts that when the Commonwealth's Attorney posed hypotheticals to both the medical examiner and a detective about the bullet trajectory, implied the medical examiner was not an expert on bullet trajectory, and used a detective that he never qualified as an expert to discredit the medical examiner, he did so in order to mislead the jury. Most of this questioning was not objected to, and the trial court overruled the single objection Leavell made to the Commonwealth's questioning of the detective. Regarding the single objection, we hold there was not prosecutorial misconduct, as it was merely an issue "involving the admission of evidence or testimony" and was "ruled upon by the trial court." *Id.* Regarding the rest of the questioning that comprises this claim of prosecutorial misconduct, we hold that the questioning and presentation of evidence did not cross the line from zealous advocacy to misconduct.

Leavell's final claim of prosecutorial misconduct relates to testimony from a detective that Freeman did not have a reputation in the community for violence and did not have a reputation for carrying a gun. Leavell asserts that because the detective did not even know if Freeman had ever purchased a gun, the prosecutor sought to mislead and create a false impression for the jury by

19

eliciting this testimony. Leavell could have objected on the basis that the officer had insufficient knowledge to provide such an opinion on Freeman's reputation or could have cross-examined the detective about the basis of his opinion. However, Leavell did neither. Further, there was nothing improper about this question that would cause it to cross the line from zealous advocacy to misconduct.

Accordingly, all of Leavell's claims of prosecutorial misconduct fail.

**E. There was no cumulative error.**

Finally, Leavell argues that her conviction should be reversed due to cumulative error. Under the cumulative error doctrine, "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). Because we have found no errors, there cannot be cumulative error. To the extent the admission of evidence that Leavell did not act consistently with someone who truly acted in self-defense may have been error, we found such potential error to be harmless. That potential error alone did not render Leavell's trial fundamentally unfair, and there are no other errors to accumulate. "Where, as in this case, however, none of the errors individually raised any real question of prejudice, we have declined to hold that the absence of prejudice plus the absence of prejudice somehow adds up to prejudice." *Id.* (citing *Furnish v. Commonwealth,* 95 S.W.3d 34 (Ky. 2002)). Accordingly, we hold there was no cumulative error in this case.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the Christian Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Robert Chung-Hua Yang
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Harrison Gray Kilgore
Assistant Attorney General